Steve S. Christensen (U.S.B. No. 6156)
ssc@ccplawyers.com
Craig L. Pankratz (U.S.B. No. 12194)
clp@ccplawyers.com
**CHRISTENSEN CORBETT & PANKRATZ, PLLC**
136 East South Temple, Suite 1400
Salt Lake City, Utah 84111-3156
Telephone: (801) 303-5800
Facsimile: (801) 322-0594
*Attorneys for Plaintiff Gregory Lynn Smith*

William B. Parsons III (U.S.B. No. 2535)
Attorney at Law
P.O. Box 22626
Salt Lake City, Utah 84122
Telephone: (801) 273-3905
Facsimile: (801) 273-3906
*Attorney for Jeri Bolinder, Heir of Gregory Lee Smith*

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **GREGORY LYNN SMITH**, on behalf of the Estate of Gregory Lee Smith and on behalf of the Heirs of Gregory Lee Smith,<br><br>Plaintiff,<br><br>vs.<br><br>**UNITED STATES DEPARTMENT OF VETERANS AFFAIRS**,<br><br>Defendants. | **COMPLAINT**<br><br>Case No. 2:12-cv-00968-BCW<br><br>Judge Brooke C. Wells<br><br>**(Jury Requested)** |

Plaintiff alleges and complains against the United States Department of Veterans Affairs as follows:

**PARTIES, JURISDICTION, VENUE, AND COMPLIANCE WITH PRE-LITIGATION REQUIREMENTS**

1. Plaintiff, Gregory Lynn Smith, is domiciled in the State of Utah.

1

2. Plaintiff is the father of Gregory Lee Smith ("Greg") and the personal representative of the Estate of Gregory Lee Smith.

3. Jeri Bolinder, formerly Jeri Smith, ("Jeri") is Greg's mother.

4. The United States Department of Veterans Affairs ("Defendant") is an administrative agency of the United States of America.

5. This Court has exclusive jurisdiction over this action under 28 U.S.C. § 1346(b)(1).

6. Venue is proper in this Court because the events or omissions giving rise to this action occurred exclusively within the Judicial District of Utah.

7. On February 9, 2012, Plaintiff served Defendant with two notices of claim under the Federal Tort Claims Act, one for the claims of the Estate of Gregory Lee Smith and one for the claims of the heirs of Gregory Lee Smith.

8. On April 9, 2012, Plaintiff served Defendant with an amended notice of claim under the Federal Tort Claims Act for the heirs of Gregory Lee Smith but did not amend the notice of claim served for the claims of the Estate of Gregory Lee Smith.

9. Six months have passed from the service of all notices of claims, and Defendant has not responded to any of them.

10. On March 6, 2012, Plaintiff requested a pre-litigation screening panel with Utah's Division of Occupational and Professional Licensing to comply with Utah's medical malpractice statutes.

11. On March 15, 2012, Defendant notified Plaintiff that it would not submit to the jurisdiction of Utah's Division of Occupational and Professional Licensing.

12. On March 30, 2012, Utah's Division of Occupational and Professional Licensing issued a certificate of compliance with Utah's medical malpractice pre-litigation statutory requirements.

### GENERAL ALLEGATIONS

13. Greg was born on July 3, 1980.

14. Greg served in the United States Army and received a medical discharge because of a back injury he suffered while serving his country.

15. Greg returned from his post to Utah.

16. To treat his back injury, doctors working for Defendant prescribed Greg excessive amounts of pain killers.

17. Greg did not want the drugs.

18. Instead, Greg wanted his back fixed.

19. Greg's ultimate goal was to become a police officer once his back healed.

20. Prior to his death, Greg had been attending Salt Lake Community College and studying criminal justice.

21. To fix his back, Greg underwent three back surgeries at the VA Medical Center.

22. The first surgery was not successful.

23. The second surgery involved putting an electric stimulator in Greg's back.

24. Greg's back responded very well to the stimulator, but the surgery was only a test to see if his back would respond to a permanent stimulator.

25. Even though Greg's back responded well to the stimulator, Defendant denied his request for a permanent stimulator to be implanted in his back.

26. But Greg persisted and finally persuaded Defendant to grant him a third surgery on his back.

27. The third surgery occurred on October 19, 2010 in Salt Lake City, Utah at the VA Medical Center.

28. Dr. Paul Amstutz ("Dr. Amstutz"), a neurosurgeon who works at the VA Medical Center in Salt Lake City, Utah performed the third surgery.

29. Dr. Amstutz is an employee of Defendant.

30. Prior to the surgery on October 19, 2010, Greg and Dorothy Mechanic ("Dorothy") an emergency medical technician and Greg's roommate, were going through the check sheet of what he needed in his bag for the hospital and packed for four days.

31. Greg's estimated time of stay was two to three days at the most.

32. At approximately 10:15 a.m., Greg checked in at the Outpatient window of the same day surgery located on the 3rd floor of the VA Medical Center.

33. At approximately, 1030 a.m., Greg was called back to change into the gown and have an IV line started. Dorothy was asked to come back with him shortly afterwards.

34. Greg was lively in chatter and had some worry about the surgery being canceled.

35. At approximately 11:45 a.m. a resident started Greg's IV.

36. The hospital staff began preparation for the surgery. Greg announced that he had awoken during his back surgery he had when in the military. They took note of that and assured him that he would be well sedated and assured that no one would leave him while he was asleep.

37. The back surgery was performed between 12:00 p.m. and 3:00 p.m.

38. The hospital staff told Dorothy that Greg's follow up appointment would be scheduled for the following Thursday to have the stimulator turned on. The appointment had been scheduled for the following Tuesday, but it was decided to wait two more days as a precaution to make sure all swelling and fluids were not going to interfere with the stimulator.

39. Greg was placed in a room and given a clear liquid diet.

40. When he awakened, Greg was in pain. He rated the pain as a 7 on a scale of 1 to 10.

41. Despite his pain, Greg was oriented and excited. His vitals were good and some drainage was on his bandage.

42. After the surgery, as he spoke with his family members and those who visited him in the hospital, Greg was ecstatic.

43. Greg was sure that the permanent implant would be as effective as the temporary implant so that he could realize his dream of becoming a police officer.

44. The next day, Wednesday October 20, 2010, Greg's friends were visiting him. His IV and Foley had been removed.

45. Greg complained that he was still in pain and was told to walk around the hospital. He was administered pain medications.

46. That afternoon, a nurse named Pam came to check Greg's vital signs.

47. Greg's oxygen levels were low. He was at 86 on room air. He was given oxygen, and his oxygen levels raised to the 90s.

48. Greg continued to have problems and often had to stop what he was doing to inhale pure oxygen.

49. In addition to his problems with his oxygen levels, Greg suffered from sleep apnea.

50. Doctors and other medical personnel working for Defendant knew that Greg suffered from sleep apnea. In fact, Dr. Amstutz told Police Officers investigating Greg's death that Greg suffered from sleep apnea.

51. Dr. Amstutz later came into Greg's room and checked on Greg. Greg described his pain, and they discussed it together.

52. Dr. Amstutz also discussed with Greg when the stimulus pump would be turned on.

53. Dr. Amstutz said that he was sending Greg home later that day.

54. Greg had been told that he was going to remain in the hospital for at least two to three days.

55. Because Greg was being discharged and had trouble with his oxygen levels, Dorothy spoke with Dr. Amstutz about Greg's oxygen levels. She asked Dr. Amstutz to prescribe a CPAP machine or oxygen to send home with Greg.

56. Dr. Amstutz said that Greg would have to follow up with his family practice physician and refused to prescribe Greg a CPAP machine or oxygen.

57. Greg was shocked he was going home and explained to Dr. Amstutz that he did not feel comfortable about leaving already.

58. Dr. Amstutz told Greg, "I feel that you being home would be better off for you than getting staph or pneumonia here."

59. Dr. Amstutz left, and Greg turned to Dorothy and told her that he did not want to go home. Dorothy asked him why. He said, "I was to stay a few days and I feel they are kicking me out to make another bed for another patient. I am afraid of leaving so soon."

60. Dorothy told him to get on the call light for his nurse and explain to her what he said to me. Pam, the nurse, walked in, and Greg had told her exactly what and how he felt about going home.

61. Pam left for a few minutes, returned to Greg, and told him, "The doctor feels you are fine to go home today."

62. When Pam left the room, Greg's attitude changed to anger and hurt.

63. Going through Pharmacy to get his post op meds and out the front doors of the hospital, Greg stressed to that he "wasn't ready to go" and that "one hand did not know what the other hand was doing."

64. When Greg was discharged, he was prescribed morphine in addition to many the pain prescriptions that Defendant had already prescribed him. In fact, Police Officers investigating Greg's death found the following among Greg's prescription drugs, all of which, on information and belief, had been prescribed to Greg by doctors working for Defendant: Duloxetine, Oxycodone, Meloxicam, Pregabalin, Sumatriptan Succinate, Morphine, Zolmitriptan, and Promethazine.

65. After being discharged, Greg met with friends, told stories, discussed his surgery and discharge, discussed his outlook on his new life without pain, and stated that he was happy to be done with his six years of Chronic back pain.

66. Later that night, more of Greg's friends visited him in his home. They wanted to take him out to eat, but Dorothy's boyfriend, Lance, would not allow it.

67. The morning of the next day, October 21, 2010, Greg appeared to be doing fine. His appetite was good, and he took his 9:00 a.m. meds.

68. Greg's pain was tolerable.

69. At about 2:00 p.m. Greg had some salami and cheese and started to complain about a migraine headache.

70. At about 3:00 p.m., Greg took his post op meds, and at about 3:30 p.m., he took medication prescribed for his migraine.

71. The medication prescribed for his migraine does not interact with the other medications prescribed to him by Defendant.

72. At approximately 3:45 p.m. to 4:00 p.m., Greg rushed into the bathroom, looked at Dorothy, and said, "Dorothy, check me out. I don't feel good".

73. Greg's color had changed drastically. He was the color of gray paste and was shaking terribly.

74. Dorothy told Greg to sit. She placed him in his chair and put his feet up on the ottoman.

75. Within moments his color was beginning to come back and his pulse rate was 88 and his breathing was rapid at 22-24 breaths per minute. Dorothy asked him if he needed to go to the ER and he told her, "No, I feel better. All I will do is wait. I'm okay."

76. Dorothy watched him some more, and he returned to his normal self.

77. Dorothy remained near Greg, every once and awhile scratching his back and making sure his pulse and breathing were fine.

78. At 5:15 p.m., Greg vomited. He said that he felt better but was not acting normal.

79. Between 6:00 p.m. and 8:30 p.m., Greg vomited three more times.

80. Dorothy was worried, and she arranged for Greg to sleep in a room close to them so that she could hear him and watch over him better.

81. Dorothy was scared he would lose his balance and fall down the stairs if he needed them.

82. At about 9:30 p.m., Lance assisted Greg to the guest room.

83. Greg lay on his left side, wrapped in a maternity pillow to keep his back supported, and bent his knees.

84. Dorothy placed the bathroom trash can near the bed and asked Greg if he was okay. He said, "Yes, I'm okay, just tired."

85. Dorothy told Greg to look into her eyes and told him, "You call for me if you need anything, do you understand?"

86. Greg replied, "Yes," and asked Dorothy to turn off the light.

87. Dorothy left the bathroom light on just in case Greg got up.

88. At about midnight on Friday October 22, 2010, Dorothy woke up and heard Greg snoring. His snoring was usual, loud and heavy. Dorothy went back to sleep feeling he was okay and finally getting rest.

89. At 7:00 a.m., Lance's clock alarm went off and Dorothy asked Lance to check on Greg.

90. Lance walked down the hall, came back, and told Dorothy that he could not get Greg to wake up.

91. Dorothy went to the room and checked Greg. He had no pulse and all his color was gone. Dorothy told Lance, "Greg is dead." Lance called 911.

92. Officers from the Sandy City Police Department responded to the call, found Greg dead in bed, and conducted an investigation.

93. Officer Jewkes of the Sandy City Police Department called Plaintiff at 7:56 a.m. to inform him that Greg had passed away.

94. Plaintiff was devastated and shocked.

95. Plaintiff, who has been employed as a police officer for approximately thirty years and has investigated homicides and suspicious deaths, called the medical examiner's office and requested an autopsy.

96. Erik D. Christensen, M.D. ("Dr. Christensen"), assistant medical examiner, conducted the autopsy of Greg's body.

97. Dr. Christensen concluded that the cause of Greg's death was "an acute mixed drug intoxication involving his prescription medications."

98. The drugs that caused Greg's death are Morphine, Oxycodone, Diazepam, and Pregabalin.

99. Dr. Christensen also noted that Greg had visceral congestion and pulmonary edema.

100. During a conversation with Plaintiff, Dr. Christensen stated that Greg's death did not have to happen.

101. Dr. Christensen also said that Greg's sleep apnea may have contributed to Greg's death but that it was unlikely that Greg would have died from sleep apnea alone without the medications.

102. Greg was buried the following week.

103. Greg's death was completely avoidable.

104. All it would have taken for him to still be alive was for the Defendant to have done one of four things: Keep Greg in the hospital longer after his back surgery, send oxygen home with him, send a CPAP home with him, or send an oxygen monitor that would have alerted Dorothy and Lance that he had stopped breathing.

105. The prescription drugs Defendant prescribed to Greg killed him.

106. All of the drugs in Greg's body were within prescribed levels when he died.

107. The prescribed drugs in Greg's system suppress a person's respiratory system.

108. The prescribed drugs stopped Greg's breathing.

109. It is advised that people with sleep apnea not take the drugs in Greg's system.

110. Greg already had breathing problems without the drugs. He suffered from sleep apnea and had trouble breathing while he was at the hospital.

111. Dr. Amstutz, knew that Greg had sleep apnea and was having breathing problems because Dorothy asked him to prescribe something to help Greg breathe at home.

112. But Dr. Amstutz did nothing except prescribe additional pain killers that combined to kill Greg.

### GREG'S CAREER IF HAD HE NOT DIED

113. Plaintiff hereby incorporates by reference all of the allegations in this Complaint as if set forth in full herein.

114. During Greg's viewing, Chief Chris Burbank of the Salt Lake City Police Department arrived unexpectedly.

115. Chief Burbank knew Greg and Plaintiff well.

116. Greg had even worked on a volunteer basis with the Salt Lake City Police Department.

117. Chief Burbank approached Plaintiff and gave him a package.

118. In the package was a frame with Greg's posthumous commission as an officer for the Salt Lake City Police Department, including Greg's badge.

119. In the commission letter, Chief Burbank indicated that Greg would have become a police officer with the Salt Lake City Police Department had he not died.

120. It was anticipated that Greg would have served as a police officer for approximately thirty years and would have received an average salary of $60,000 annually.

### EFFECT OF GREG'S DEATH ON PLAINTIFF

121. Plaintiff hereby incorporates by reference all of the allegations in this Complaint as if set forth in full herein.

122. Plaintiff delivered Greg. He was the first to see him, to hold him, and to watch him, hanging upside down breathing his first breath. Greg's death makes it hard for Plaintiff to breathe. It makes it hard for him to sleep.

123. Plaintiff cries several times a week because of the loss of Greg.

124. Greg is in Plaintiff's heart and mind all the time, and he actually finds himself telling himself that he needs to think of something else.

125. Plaintiff aches for Greg and will ache for him for the rest of his life.

126. Greg grew up wanting to be just like Plaintiff.

127. Greg was Plaintiff's closest friend. They can no longer speak with each other.

128. Plaintiff cannot erase the messages that Greg left on his telephone before his death.

129. Plaintiff is consumed with thoughts of what he could have done with Greg had he not died, including birthdays, holidays, Christmases, and spending time with the children Greg never got to have.

130. Plaintiff misses those times when Greg would come to him with a problem and ask for advice.

131. The future is gone, along with all the laughs and the teasing that they would have enjoyed together.

132. Plaintiff will never see Greg in his police uniform, "Serving and Protecting", again, as he swore to do as a soldier.

133. Plaintiff has spent countless nights looking at the ceiling in the dark, watching the time move so slowly until he has to get up.

134. Plaintiff often finds himself wondering if Greg is safe and finds himself thinking that he needs to call him.

135. The fact that Greg is not safe and not available for a simple phone call is devastating.

### EFFECT OF GREG'S DEATH ON JERI

136. Plaintiff hereby incorporates by reference all of the allegations in this Complaint as if set forth in full herein.

137. Every day of her life, for the rest of her life, Jeri will miss the hugs and kisses, the smiles, the laughter, and the happiness Greg brought into her life.

138. Greg and Jeri had a close relationship, and he made the holidays, Mother's Day, his birthday, Jeri's birthday, and their family gatherings joyous and fun.

139. Jeri has a giant, empty hole in her heart. From the day he was born and they laid his beautiful little body in her arms, he had been a source of joy that cannot be expressed. As he grew older he became a source of strength for Jeri. She had expectations of a long life for him.

140. While Greg was alive, Jeri constantly thought of loving, teaching, supporting, encouraging, and protecting him. She had expectations for his life: college, getting married and having a family. Greg will never have those opportunities. Jeri will never be able to see his

children, cherish her grandchildren, and watch them grow. She will never be able to watch Greg grow and fulfill his destiny as a husband and father.

141. Now that Greg is dead, Jeri stays up late waiting for the nightly calls that he used to make to check on her. Those calls will never come again.

142. Jeri worries constantly about her other children and grandchildren because she now knows how easily they can be taken.

143. Jeri is always trying to explain to Greg's brother and sister and their children why Greg had to die, and she has no answers.

144. Jeri lies awake at night and cries because her heart aches to see, touch, and hold her son again. He will always be her baby boy. She sees his beautiful face in her dreams and wakes to the reality that she will never hold him again.

145. Some days Jeri has to make herself get out of bed and go to work because she has significant anxiety. She just wants to pull the covers up over her head and curl into a ball. Some days she cannot leave the house because she is so full of overwhelming sadness that all she can do is cry.

146. She lost her job because she could not and still cannot concentrate.

147. Jeri's world has been smashed, and she cannot understand why everything around her continues. She still cannot believe Greg will not come smiling through her door. Her mind shuts down, and she cannot do the daily tasks that are expected of her. She sees a beautiful sunrise or sunset and thinks of how much he enjoyed life and helped everyone around him to be happy. She hears music that they used to listen to together and her heart again stops and begins to ache for

him. She goes places with her family, but her family is fractured. They will never be whole again.

148. Greg is always on Jeri's mind, in her heart, and in her prayers.

149. Jeri sees other young men Greg's age everywhere fulfilling their dreams, and she hurts because Greg will never fulfill his.

150. Jeri will never hear Greg again say, "Hi Momma. I love you."

## FIRST CLAIM: NEGLIGENCE
### (On behalf of Greg's Estate)

151. Plaintiff hereby incorporates by reference all of the allegations in this Complaint as if set forth in full herein.

152. Defendant owed a duty to Greg to provide him with medical treatment according to the generally accepted standard of care for prescribing medication, for back surgery, and for post operation recovery.

153. Defendant breached its duty to Greg because its acts and omissions fell below the standard of care it owed to Greg.

154. As the proximate cause of Defendant's breach of its duty, Greg suffered lost wages, funeral expenses, pain, suffering, and inconvenience.

## SECOND CLAIM: WRONGFUL DEATH
### (On behalf of Greg's heirs)

155. Plaintiff hereby incorporates by reference all of the allegations in this Complaint as if set forth in full herein.

156. Greg died without fathering any children.

157. Greg was not married when he died.

158. Greg is survived by his mother, his father, his brother, his sister, four nephews, and one niece.

159. Defendant owed Greg's heirs a duty not to cause Greg's death negligently.

160. Defendant breached that duty when its acts and omissions proximately caused Greg's death.

161. Defendant's breach of its duty has proximately caused Greg's heirs to suffer the following damages: loss of support, loss of care and solicitude for the welfare of the family, loss of comfort and the pleasure, loss of inheritance, emotional distress, and loss of society, love, companionship, protection, and affection.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays

1. As to the first claim,

    a. That judgment be rendered against Defendant for damages in an amount to be proved at trial;

    b. For prejudgment interest at the rate of 10% per annum, from October 22, 2010, in an amount to be proved at trial;

    c. For costs of court.

2. As to the second claim,

    a. That judgment be rendered against Defendant for damages in an amount to be proved at trial;

    b. For prejudgment interest at the rate of 10% per annum, from October 22, 2010, in an amount to be proved at trial;

    c. For costs of court.

## DEMAND FOR JURY TRIAL

Furthermore, Plaintiff hereby enters his demand for a trial by jury on the foregoing claims.

DATED this 15th day of October, 2012.

                              **CHRISTENSEN CORBETT & PANKRATZ, PLLC**

                              /s/ Craig L. Pankratz
                              Steve S. Christensen
                              Craig L. Pankratz
                              *Attorneys for Plaintiff*